IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

DEMARCUS RAGLAND,

Defendant.

CRIMINAL CASE NO.

1:10-CR-0472-SCJ-JFK

## **REPORT AND RECOMMENDATION**

Pending before the court are Defendant Demarcus Ragland's motion [Doc. 14] to suppress statements and motion [Doc. 15] to suppress evidence.  An evidentiary hearing was held on the motions on May 24, 2011.[1]  [Doc. 24].  Following the hearing, Defendant filed a brief in support of his motion to suppress evidence; however, he did not address in any manner the motion to suppress statements.  [Doc. 25].  The court finds that Defendant abandoned any challenge to the admissibility of the statements when he failed to mention the statements in his post-hearing brief.  See United States v. Zekic, 2010 WL 4962985, at *1 (N.D. Ga. October 28, 2010) (citing Access Now, Inc. v. Southwest Airlines Co., 385 F.3d 1324, 1330 (11th Cir. 2004) ("[T]he law is by

---

[1]Citations to the evidentiary hearing transcript are:  (Tr. at ).

AO 72A
(Rev.8/82)

now well settled in this Circuit that a legal claim or argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed.")), <u>adopted by</u> 2010 WL 4967825 (N.D. Ga. December 1, 2010).  And, in any event, the statements are admissible as spontaneous and volunteered statements that were not the result of interrogation or the functional equivalent of interrogation.[2]  <u>See</u> <u>Rhode Island v. Innis</u>, 100 S. Ct. 1682, 1689-90 (1980); <u>United States v. Sanders</u>, 315 Fed. Appx. 819, 823 (11th Cir. 2009) ("'Voluntary and spontaneous comments by an accused . . . are admissible evidence if the comments were not made in response to government questioning.'") (quoting <u>Cannady v. Dugger</u>, 931 F.2d 752, 754 (11th Cir. 1991)); <u>United States v. Hendrieth</u>, 922 F.2d 748, 751 (11th Cir. 1991) ("When a defendant deliberately chooses to initiate or continue a conversation, . . . the statements violate neither the Fifth Amendment right against self-incrimination nor the Sixth Amendment right to counsel.") (citations omitted).

With respect to the motion to suppress evidence, Defendant focuses primarily on the credibility of the Fulton County deputy sheriffs who testified, un-rebutted, at the hearing, contending that their testimony was not believable.  [Doc. 25 at 4-5].

_____

[2]The circumstances surrounding Defendant's statements are set forth in the statement of facts *infra*.

Alternatively, Defendant argues that the deputies did not have a reasonable suspicion that Defendant was engaged in criminal activity to support his detention nor probable cause to support his arrest; therefore, the evidence seized, quantities of marijuana and crack cocaine, a firearm and currency, should be suppressed.  [Id. at 5-6].  The Government responds opposing the motion to suppress evidence contending that based on the totality of the circumstances, in light of the deputies' training and experience, the facts established at the hearing justified the stop and subsequent arrest.  [Doc. 29 at 4-8].

After consideration of the parties' arguments and relevant and persuasive legal authority, the court recommends denying Defendant's motions to suppress.

I.     **Facts**

On October 7, 2010, Fulton County Sheriff Office ("FCSO") Deputies David Moreland and Shedrick Reid, were on patrol between 6:00 a.m. and 7:00 a.m., in the vicinity of Northside Drive and Hill Avenue, near the Georgia Dome.[3]  (Tr. at 5-7, 34-

---

[3]Deputy Moreland had been with the FCSO for four years and had previously worked for a total of approximately four years as a patrol officer with the Talapoosa and Douglasville Police Departments.  (Tr. at 4).  During eight years as a law enforcement officer, he had worked on approximately fifty to seventy drug cases and had observed hand-to-hand drug transactions on fifteen to twenty occasions.  (Tr. at 4-5).  Deputy Reid had worked in the FCSO for five years and had previously worked in the DeKalb County Sheriff Office for four years.  (Tr. at 44-45).  He had received

3

37, 45, 47; Def. Ex. 1).  This area was considered a "high crime area" due to the number of 911 calls received and the numerous warrants served in the area for drug and violent crime offenses.  (Tr. at 5-7, 21, 47).  The deputies were in the area on a daily basis either on patrol or serving warrants.  (Tr. at 6-7, 47).  The officers were in uniform, with badges, firearms and handcuffs displayed, and were in a marked patrol vehicle.  Deputy Reid was driving.  (Tr. at 8, 45).

The deputies were on Northside Drive, and as they approached and turned onto Hill Avenue, they observed two black males standing in the middle of the street conducting what the deputies believed to be a hand-to-hand drug transaction.  (Tr. at 8-9, 22-23, 45-48; Def. Ex. 3).[4]  The deputies made the turn onto Hill Avenue, which was a one-way street, going the wrong way, because of their observation of one of the men reaching his hand out to the second man, "like, he passed off something."  (Tr. at 8, 22-23).  The deputies could not see what was passed between the men.  (Tr. at 24).

---

training and had experience in observing hand-to-hand drug transactions.  (Tr. at 47-48).

[4]The X marked on the photograph is on Hill Avenue at the approximate location where the officers observed the two black males from Northside Drive, which is seen in the distance on the photograph.  (Tr. at 28-30).

4

The lighting was low but Officer Moreland stated that he could see what occurred because of the street lights and the patrol vehicle headlights. (Tr. at 9).

The deputies stopped the patrol vehicle within one to one and one-half car lengths from the men, and both deputies exited the vehicle. (Tr. at 9-10, 45). Deputy Reid approached the second man as Deputy Moreland approached the male subsequently identified as Defendant Ragland.[5] (Tr. at 10-11, 13, 45-46, 50). Deputy Moreland stated that as he approached Defendant, Defendant started to back away, "He took a step back and turned quickly and attempted to, what I would say, flee on foot."[6] (Tr. at 11, 24, 30). As Defendant stepped back, because the deputy thought he was about to flee, the deputy told him to stop, but Defendant turned away from him. (Tr. at 11-12, 25). The deputy approached quickly and grabbed Defendant's arm before he could run and was able to wrestle Defendant to the ground. (Tr. at 12-13, 25, 31). As the deputy grabbed Defendant's arm and they fell to the ground, the deputy observed

_____

[5]Deputy Reid stated that he approached the second male, whose name he did not remember, and asked him if he had any drugs. The man replied that he did not. (Tr. at 45). The deputy did not search the man and accepted his word that he was heading to a nearby store. (Tr. at 46, 50). When the deputy determined that the man did not have any outstanding warrants, he was allowed to leave. (Tr. at 45).

[6]The deputy testified that he had experienced individuals who were confronted under these circumstances try to flee. (Tr. at 11).

5

a "plastic bag with some smaller baggies, [and] a green leafy substance exposed" in Defendant's shirt sleeve.  (Tr. at 13, 25).  Based on his training and experience, the deputy believed the substance to be marijuana.  (Tr. at 13-14).  When the deputy saw the suspected drugs, he handcuffed Defendant behind his back and retrieved the suspected drugs.[7]  (Tr. at 14, 25).

While Defendant remained on the ground, the deputy obtained and ran Defendant's name through G.C.I.C. and received a report that Defendant had two outstanding warrants.  (Tr. at 14, 25-26).  The deputy then assisted Defendant to his feet, and as Defendant stood up, a handgun fell out of the waist line of Defendant's pants.  (Tr. at 14-15, 26).  Deputy Moreland retrieved and secured that weapon, which was loaded with a round in the chamber.  (Tr. at 15).  The deputy patted Defendant down, finding approximately $63.00, and placed him in the back seat of the patrol vehicle.  (Tr. at 17).  As Defendant sat in the back of the patrol vehicle, he yelled, "Serg, you ain't going to charge me with that gun, are you.  I don't need that."  (Tr. at 18-19).  Neither deputy had made any comments, threats or promises to Defendant or asked him any questions.  (Tr. at 18-19).  The deputies did not respond to Defendant.

---

[7]When the deputy subsequently examined the plastic baggies, he observed crack cocaine also inside.  (Tr. at 16).

6

(Tr. at 20).  When the deputies and Defendant arrived at the jail about forty-five minutes later, Defendant repeated the comments about not charging him with the firearm.  (Tr. at 18-10).  The deputies had not asked Defendant any questions or made any comments, threats or promises to him, and they did not respond to his statement.  (Tr. at 20).

Additional facts will be set forth as necessary during discussion of Defendant's motion to suppress evidence.

## II.    Discussion

Defendant bases his motion to suppress evidence on an attack on the credibility of the deputy sheriffs who testified at the hearing and by contending that the evidence does not support a finding of reasonable suspicion for a stop or probable cause for an arrest.  [Doc. 25].  The Government, not addressing the credibility arguments raised by Defendant, responds that the evidence establishes that the deputies lawfully detained and then arrested Defendant.  [Doc. 29].

### a.    Witness Credibility

In support of his argument that Deputy Moreland was not a credible witness, Defendant contends that it is not credible to believe that the officers could observe from Northside Drive, at 6:00 a.m. to 6:30 a.m. in early October, a hand-to-hand drug

7

transaction, that Deputy Moreland's testimony about observing the transaction changed, that if there had been a drug transaction, the second man would have been searched, and that no one would conduct a drug transaction in the middle of the street when the surrounding area was more secluded.  [Doc. 25 at 4-5].  The court, having observed the testimony of both witnesses, finds their testimony credible.  See United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002) ("Credibility determinations are typically the province of the fact finder because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses.").  In weighing the credibility of a witness, the court takes "into account the interests of the witnesses, the consistencies or inconsistencies in their testimonies, and their demeanor on the stand." Id. at 750; see also United States v. Wein, 2006 WL 2128155, at *3 (W.D. Pa. July 27, 2006) (noting that "customary techniques to ascertain the credibility of the witnesses" included, but was "not limited to: appearance and conduct of each witness, the manner in which he testified, the character of the testimony given, his intelligence, motive, state of mind, and demeanor while on the stand").  And, unless the evidence "'is contrary to the laws of nature, or is so inconsistent or improbable on its face that no reasonable factfinder could accept it" or unless the factfinder's determinations appear to be

8

"'unbelievable[,]'" a reviewing court must accept those findings of fact.  <u>Ramirez-Chilel</u>, 289 F.3d at 749 (citations omitted); <u>accord</u> <u>United States v. Griffith</u>, 397 Fed. Appx. 613, 617-18 (11th Cir. 2010).

The only witnesses who testified at the hearing testified consistently that they observed what they thought to be a hand-to-hand drug transaction involving Defendant Ragland.  (Tr. at 8-9, 23, 45-48).  Deputy Moreland forthrightly stated that he could not see what passed between the men but that he saw one man reach out as if to pass off something to the second man.  (Tr. at 8, 23-24).  The Deputy also stated that although the lighting was low, the street lights, which can be observed in Defendant's exhibits, and the headlights on the patrol vehicle provided sufficient lighting for the deputies to observe the men's movements.  (Tr. at 9; Def. Exs. 1, 3).  The court does not find that Deputy Moreland changed his story about his observations.  He always testified that he saw the men interacting from Northside Drive which caused the deputies to turn onto Hill Avenue.  The fact that Hill Avenue was a one-way street has little bearing on the events testified to by the deputies.  (Tr. at 8, 22-23, 30).  And the fact that neither Defendant nor the other man used the best judgment in conducting their business in the middle of the street does not undermine Deputy Moreland's testimony.  Based on the court's experience in hearing cases of this type and reading

the facts in other cases, some being cited *infra*, hand-to-hand transactions quite often occur under the type of circumstances testified to by the deputies. The court also notes that the general area, the low-lighting and the time of day might have given Defendant a unjustified sense of security. As to Deputy Reid's handling of the second man suspected of being involved in the transaction, the deputy explained that he was conducting an interview, that he accepted the man's word that he did not have any drugs, and that, given the man's demeanor and cooperation, as well as the lack of any warrants, there was no basis for the officer to further detain him or conduct a search. (Tr. at 45-48, 50). The court agrees with the deputy's assessment of the situation. Finally, the demeanor and manner in which the deputies testified, fully answering all of the questions put to them, indicates that they related to the best of their ability what they observed on October 7, 2010.

### b.    Detention and Arrest

Defendant argues that even if the court credits the testimony of Deputy Moreland, the facts as relayed by him did not initially establish reasonable suspicion for detention and subsequently did not establish probable cause for the arrest. Based on the totality of the circumstances, the court finds that at the time of Defendant's detention, that is, when Deputy Moreland grabbed his arm, the deputy had a reasonable

suspicion that Defendant was engaged in criminal activity, and that at the time that Defendant was arrested, that is, when the suspected marijuana was discovered, the deputy had probable cause for the arrest.

Law enforcement agents may briefly detain individuals for purposes of investigating a crime if they have a reasonable, articulable suspicion based on objective facts that the individual has engaged in, or is about to engage in, criminal activity.  See Terry v. Ohio, 88 S. Ct. 1868 (1968); United States v. Lindsey, 482 F.3d 1285, 1290 (11th Cir. 2007) (same).  "[T]he 'reasonableness' standard requires that a police officer 'be able to point to specific and articulable facts, which, when taken together with rational inferences from those facts, reasonably warrant that intrusion.'"  United States v. Mikell, 102 F.3d 470, 474-75 (11th Cir. 1996) (citing Terry, 88 S. Ct. at 1880); see also  United States v. Blackman, 66 F.3d 1572, 1576 (11th Cir. 1995) ("The reasonableness of the officers' conduct must be judged against an objective standard: would the facts available to the officer at the moment of the seizure or search warrant a man of reasonable caution in the belief that the action taken was appropriate.") (citations and internal quotation marks omitted).  Such brief investigatory stops do not require probable cause.  See United States v. Sokolow, 109 S. Ct. 1581, 1585 (1989).

11

"'While reasonable suspicion is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop.'" Lindsey, 482 F.3d at 1290 (quoting Illinois v. Wardlow, 120 S. Ct. 673, 675-76 (2000)) (internal quotation marks omitted); see also Mikell, 102 F.3d at 475. "Also, '[a] reasonable suspicion of criminal activity may be formed by observing exclusively legal activity,' . . . even if such activity is 'seemingly innocuous to the ordinary citizen.'" Lindsey, 482 F.3d at 1290 (citations omitted). In United States v. Smith, 201 F.3d 1317 (11th Cir. 2000), the Eleventh Circuit Court of Appeals stated, "In deciding whether the detaining officers had reasonable suspicion, we look at the totality of the circumstances known to the detaining officers at the time of the detention." Id. at 1323; see also Sokolow, 109 S. Ct. at 1585 (the determination as to the initial validity of the stop is based on a consideration of the totality of the circumstances). And, when considering the facts and information known to the agents, the court should view all of the circumstances "in the light of the officers' special training and experience." Smith, 201 F.3d at 1323; accord United States v. Reed, 402 Fed. Appx. 413, 415 (11th Cir. 2010) ("In making these commonsense judgments, '[t]he stopping officer is expected to assess the facts in light of his professional

12

experience. . . .'") (citation omitted); United States v. Knight, 336 Fed. Appx. 900, 902

(11th Cir. 2009) ("Great deference is given to the judgment of trained law enforcement

officers on the scene.") (citations and internal quotation marks omitted); United States

v. Diaz-Lizaraza, 981 F.2d 1216, 1221 (11th Cir. 1993) ("While none of these actions

is criminal on its face, together they did provide the trained agents with reasonable

suspicion" that the defendant was involved in criminal activity.).

However, a detention occurs "only when, by means of physical force or a show

of authority, [a person's] freedom of movement is restrained.  Only when such restraint

is imposed is there any foundation whatever for invoking constitutional safeguards."

United States v. Mendenhall, 100 S. Ct. 1870, 1877 (1980).  As the Supreme Court

clarified in California v. Hodari D., 111 S. Ct. 1547 (1991), absent acquiescence to the

show of authority, a seizure under the Fourth Amendment has not occurred.  Id. at

1555-52; see also United States v. Jordan, 635 F.3d 1181, 1186 (11th Cir. 2011) ("The

ultimate inquiry remains whether a person's freedom of movement was restrained by

physical force or by *submission* to a show of authority.") (emphasis added).  In United

States v. Franklin, 323 F.3d 1298 (11th Cir. 2003), the Eleventh Circuit Court of

Appeals applied this reasoning to an encounter between law enforcement officers and

an individual they observed while on patrol.  The officers, who were part of a special

13

enforcement operation and operating in a two-vehicle caravan, approached the defendant who was standing in a "problem area" at night under a "no loitering" sign. Id. at 1300.  As the uniformed officers exited their vehicles in order to question the defendant about what he was doing, the defendant fled.  The officers chased him and eventually apprehended the defendant some distance from where the officers first encountered him.  Id.  The court found that the officers' decision to stop and exit their vehicles to approach the defendant to speak with him did not constitute a seizure, but a consensual encounter not requiring justification.  Id. at 1301; see United States v. Perez, 443 F.3d 772, 778 (11th Cir. 2006) ("Indeed, '[t]he mere fact that a law enforcement officer approaches an individual and so identifies himself, without more, does not result in a seizure.' . . . Moreover, . . . , the simple act of police questioning does not constitute a seizure.") (citations omitted).  In Franklin, the court found that the defendant "was seized, as defined by the Fourth Amendment, when [the officer] caught and tackled him. . . ."  323 F.3d at 1301; see also Jordan, 635 F.3d at 1186 ("When a suspect flees from the police, he is not submitting to their authority and therefore is not seized.").  Additionally, because the defendant was not seized until tackled, the officers could consider all that occurred prior to that time in establishing a reasonable suspicion for the detention.  Franklin, 323 F.3d at 1301.

14

Likewise, in this case, the court finds that Defendant was not detained, requiring reasonable suspicion, until Deputy Moreland grabbed his arm and wrestled him to the ground.  The deputies' actions in pulling up near to the location where Defendant and the second man were standing and exiting their patrol vehicle to approach and speak with the men did not constitute a seizure.  (Tr. at 8-11).  See Perez, 443 F.3d at 778.  Similarly, issuing the command for Defendant to stop, as he attempted to flee, which Defendant ignored, did not constitute a seizure.  (Tr. at 11-12).  See Jordan, 635 F.3d at 1186; Franklin, 323 F.3d at 1301.  At the point that Defendant was seized, the court must determine whether the deputy's action in detaining Defendant "was justified at its inception," that is, was there a reasonable suspicion of criminal activity.  United States v. Acosta, 363 F.3d 1141, 1144 (11th Cir. 2004) (citations and internal quotation marks omitted).  Based on the facts known to the deputy at the time of Defendant's detention, there was reasonable suspicion to justify the stop.

When Deputy Moreland seized Defendant by grabbing his arm, the deputy was aware of the following facts.  First, the deputies observed Defendant and the second man in a high crime area, a conclusion based on their experience in the area due to 911 calls and serving hundreds of warrants for drug and violent offenses in the area.  (Tr. at 5-7, 47).  While not establishing reasonable suspicion, the Supreme Court has

15

included "the fact that the stop occurred in a 'high crime area' among the relevant contextual considerations in a <u>Terry</u> analysis." <u>Wardlow</u>, 120 S. Ct. at 676; <u>accord United States v. Mitchell</u>, 407 Fed. Appx. 407, 410 (11th Cir. 2011) ("Although an area's reputation for criminal activity, standing alone, cannot support a reasonable suspicion of criminal activity, it is a factor that may be considered when determining if a reasonable suspicion exists."); <u>Reed</u>, 402 Fed. Appx. at 415 (same).

Second, the deputies observed Defendant engaging in what they believed to be, based on their training and experience, a hand-to-hand drug transaction. (Tr. at 5, 8-9, 46-48). Although the deputies could not observe what was passed, Deputy Moreland stated that he saw one of the men reach out his hand as if to pass off something to the second man. (Tr. at 8-9, 23-24). Such observations by trained law enforcement officers is another factor to be considered in establishing reasonable suspicion. <u>See, e.g.</u>, <u>United States v. Jones</u>, 562 F.3d 768, 776 (6th Cir. 2009) (the experienced officer's recognition of conduct indicative of "flagging," that is, drug trafficking, based on his observations as he patrolled in known drug-trafficking area, is a factor contributing to a finding of reasonable suspicion); <u>United States v. Harris</u>, 188 Fed. Appx. 498, 501-02 (7th Cir. 2006) (when considered with other factors, especially the refusal to obey commands, the deputy's observation of conduct that he believed

16

constituted an exchange of drugs, established reasonable suspicion); United States v. Lopez, 2009 WL 1140096, at *5 (M.D. Pa. April 28, 2009) (observation of suspects, in a high crime area, meeting and appearing to exchange a small article, without shaking hands, supported the officers' belief the suspects engaged in hand-to-hand drug transaction establishing reasonable suspicion); United States v. Jolly, 2009 WL 150662, at *4 (S.D. Fla. January 21, 2009) ("Courts have found reasonable suspicion where the officers observed a transfer of some sort coupled with other factors."); United States v. Meadows, 2007 WL 2738895, at *3 (S.D. Ohio September 13, 2007) (the officer's belief that he saw the individuals exchange two objects, under circumstances that appeared to be a hand-to-hand drug transaction, contributed to reasonable suspicion finding).

Deputy Moreland also relied on the facts that Defendant's conduct was evasive and that he refused to obey the deputy's directive to stop. Deputy Moreland testified that Deputy Reid stopped the patrol vehicle near the men, and both deputies exited the vehicle. (Tr. at 9-10, 45). Deputy Moreland approached Defendant Ragland. (Tr. at 10-11, 13, 45-46, 50). The deputy stated that as he approached Defendant, Defendant started to back away, "He took a step back and turned quickly and attempted to, what I would say, flee on foot[,]" conduct that the deputy had observed before under similar

17

circumstances. (Tr. at 11, 24, 30). As Defendant stepped back, because the deputy thought he was about to flee, the deputy told him to stop, but Defendant turned away from him. (Tr. at 11-12, 25). The deputy approached quickly and grabbed Defendant's arm before he could run and was able to wrestle Defendant to the ground. (Tr. at 12-13, 25, 31).

In Wardlow, the Supreme Court stated, "Our cases have also recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." 120 S. Ct. at 676. The Supreme Court further noted, "Headlong flight-wherever it occurs-is the consummate act of evasion:  It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." Id. However, contrary to Defendant's argument [Doc. 25 at 5-6], "the Supreme Court in Wardlow plainly did not hold that evidence of the defendant's unprovoked flight may not be considered unless it is 'headlong.'" United States v. Gordon, 231 F.3d 750, 757 (11ᵗʰ Cir. 2000). The Eleventh Circuit Court of Appeals continued, "Nor, in our view, would such a limitation be appropriate." Id.; see also United States v. Singleton, 360 Fed. Appx. 444, 445 (4ᵗʰ Cir. 2010) (noting that evasive conduct such as turning and walking away upon noticing police is evasive conduct and may be considered "even if the conduct stops short of headlong flight"). "Evasive behavior[, in and of itself,] is a 'pertinent

AO 72A
(Rev.8/82)

factor' . . . ." <u>Mitchell</u>, 407 Fed. Appx. at 410; <u>see, e.g.</u>, <u>Reed</u>, 402 Fed. Appx. at 416 (officer in high crime area who observed "furtive 'fight or flight' eye movement, as well as hand and body movements and positioning that indicated . . . that Reed was attempting to conceal or discard something as the officer approached" provided reasonable suspicion); <u>United States v. Oglesby</u>, 597 F.3d 891, 894 (7th Cir. 2010) (noting that the defendant's evasive conduct, that is, nervousness and backing away from officers, reasonably led the officers to believe he might be a flight risk); <u>Jones</u>, 562 F.3d at 777 (defendant's nervous and frightened reaction to the officer's approach, apparently in defiance, contributed to the reasonable suspicion finding).

And Defendant's failure to obey Deputy Moreland's command to stop, instead continuing to turn around as if to flee, may be considered in the reasonable suspicion analysis because at the time Defendant refused to obey the command, Defendant had not yet been detained.  <u>See</u> <u>Singleton</u>, 360 Fed. Appx. at 445-46 (noting that, after the officers observed "a 'fright or flight' expression on [the defendant's] face which, in the officers' experience, meant he was getting ready to take off running[,]" the defendant not only turned away from the officers and walked in the opposite direction but he ignored the request to stop); <u>Harris</u>, 188 Fed. Appx. at 501-02 ("We have held that walking away quickly in the face of commands by police officers to stop is evasive

19

behavior that contributes to the reasonableness of an officer's suspicion."); Meadows, 2007 WL 2738895, at *3 (noting that, after observing what the officer believed to be a drug transaction, the defendant turned away from approaching officers and ignored the officer's repeated instruction to stop were factors contributing to the finding of reasonable suspicion). The fact that Deputy Moreland was able to prevent Defendant from actually fleeing headlong does not detract from the facts that Defendant had just engaged in what appeared to be a drug transaction, in a high crime area, and that, when approached by law enforcement, he responded evasively-in a manner which in the officer's experience indicated that Defendant intended to flee-and then ignored the command of the deputy. All of these facts provided a reasonable suspicion that Defendant had or was engaging criminal conduct to support the brief detention of Defendant to investigate the deputy's suspicion.

Because there was reasonable suspicion to support a brief investigatory stop of Defendant, the court next considers whether the events subsequent to the initial stop were reasonably related in scope to the circumstances which justified the stop, see United States v. Hardy, 855 F.2d 753, 758 (11th Cir. 1988), or if, as Defendant contends, the deputy's actions constituted an arrest. When determining if an encounter constituted a *de facto* arrest, several factors should be addressed, including: the law

enforcement purposes to be served by the stop, the time needed to effectuate the purposes, the law enforcement officer's diligence in pursuing the investigation, and the scope and intrusiveness of the detention.  See United States v. Sharpe, 105 S. Ct. 1568, 1575 (1985); Acosta, 363 F.3d at 1146 (same).  And, "the most important factor 'is whether the [deputies] detained [Defendant] to pursue a method of investigation that was likely to confirm or dispel their suspicions quickly, and with a minimum of interference.'"  United States v. Gil, 204 F.3d 1347, 1351 (11th Cir. 2000) (quoting Hardy, 855 F.2d at 759).

In resolving this issue, "[n]o brightline test separates an investigatory stop from an arrest.  Instead, whether a seizure has become too intrusive to be an investigatory stop and must be considered an arrest depends on the degree of intrusion, considering all the circumstances."  Blackman, 66 F.3d at 1576.  The fact that law enforcement officers draw their weapons, order suspects out of their vehicles or to lie on the ground, conduct a frisk for weapons, handcuff or secure suspects, or ask for identification does not necessarily convert a stop into an arrest requiring probable cause.  See Acosta, 363 F.3d at 1146-47; Diaz-Lizaraza, 981 F.2d at 1221; United States v. Aldridge, 719 F.2d 368, 371 (11th Cir. 1983).  In United States v. Hastamorir, 881 F.2d 1551 (11th Cir. 1989), in which the officers detained a suspect by the display of firearms and

21

handcuffing, the court declined to find that the detention constituted an arrest and stated, "'the use of a particular method to restrain a person's freedom of movement does not necessarily make police action tantamount to an arrest. The inquiry . . . is reasonableness.'" Id. at 1556-57 (quoting United States v. Kapperman, 764 F.2d 786, 790 n.4 (11th Cir. 1985)). The facts in this case establish that the deputy's actions were reasonable and undertaken to quickly investigate the circumstances leading up to the seizure. In fact, within seconds of the seizure, Deputy Moreland had probable cause to arrest Defendant.

Both the Defendant and the deputy only ended up on the ground due to Defendant's failure to comply with the deputy's command and then the deputy's reaction to Defendant's attempt to flee. (Tr. at 12-13, 24-25). And, as Deputy Moreland and Defendant fell to the ground, the deputy observed a "plastic bag with some smaller baggies, [and] a green leafy substance exposed" in Defendant's shirt sleeve, which based on his training and experience, the deputy believed the substance to be marijuana. (Tr. at 13-14, 25). When the deputy saw the suspected drugs, he handcuffed Defendant behind his back and retrieved the suspected drugs. (Tr. at 14, 25). Once Defendant was found in possession of the suspected controlled substance, the deputy had probable cause for his arrest. See Maryland v. Pringle, 124 S. Ct. 795,

22

799 (2003) ("It is uncontested in the present case that the officer, upon recovering the five plastic glassine baggies containing suspected cocaine, had probable cause to believe a felony had been committed."); United States v. Edwards, 2007 WL 2479288, at *8 (N.D. Ga. August 28, 2007) (observation of suspected quantity of marijuana during consensual encounter established probable cause for arrest); United States v. Blake, 2006 WL 3933681, at *4 (S.D. Ga. September 7, 2006) (based on officer's observation of suspected cocaine in plain view, there was "sufficient probable cause to arrest" the defendant); and see Hill v. Georgia Power Co., 786 F.2d 1071, 1079 (11th Cir. 1986) (applying Georgia law and finding that discovery of suspected marijuana gave the arresting officers "ample probable cause to believe a crime had been committed" and furnished the exigent circumstances to justify warrantless arrest).

Once Defendant was lawfully under arrest for possession of the suspected marijuana and after determining that there were two outstanding warrants for Defendant's arrest, the deputy then assisted Defendant to his feet for the purpose of conducting a pat down, and as Defendant stood up, a handgun fell out of the waist line of Defendant's pants. (Tr. at 14-15, 25-26). Deputy Moreland retrieved and secured that weapon, which was loaded with a round in the chamber. (Tr. at 15). The deputy patted Defendant down, finding approximately $63.00, and placed him in the back seat

23

of the patrol vehicle. (Tr. at 17). Seizure of both the firearm and currency did not violate Defendant's rights, because the deputy was authorized to search Defendant incident to arrest. See United States v. Robinson, 94 S. Ct. 467 (1973); Chimel v. California, 89 S. Ct. 2034 (1969).

Based on the totality of the circumstances, the court finds that Defendant's detention was based on reasonable suspicion and that his subsequent arrest was based on probable cause; accordingly, the evidence seized from his person, that is, the drugs, firearm and currency, are admissible in evidence.

## III.    Conclusion

For the foregoing reasons and cited authority, the court **RECOMMENDS** that Defendant's motions [Docs. 14 and 15] to suppress be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, declared Ready for Trial.

**SO RECOMMENDED AND ORDERED** this 16th day of August, 2011.

JANET F. KING
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/82)